IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GREGORY SHANE JONES, | ) | CASE NO. 1:25-CV-00873-BMB |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.    Introduction

Plaintiff, Gregory Shane Jones ("Jones"), seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

Jones raises four issues on review of the Administrative Law Judge's ("ALJ") decision, arguing

1. The ALJ's residual functional capacity appraisal reflects legal error and lacks support from substantial evidence secondary to a failure to meaningfully consider and account for the residuals of Plaintiff's traumatic brain injury.

2. The ALJ's determination reflects legal error and lacks support from substantial evidence secondary to her failure to abide by the regulations governing the consideration of opinion evidence as well as unsupported findings made by the adjudicator in the course of appraising the opinion evidence of record.

3. The ALJ failed to abide by the Appeals Council's remand order.

4.    The ALJ's decision is not supported by substantial evidence and the Commissioner's position is not substantially justified.

(ECF Doc. 6, p. 9).

Because the Administrative Law Judge applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Jones' application for DIB and SSI be affirmed.

## II.    Procedural History

Jones filed for DIB and SSI on June 10, 2022, alleging a disability onset date of October 9, 2019. (Tr. 175-81). The claims were denied initially and on reconsideration. (Tr. 88-89, 112-113). Jones then requested a hearing before an ALJ. (Tr. 146-47). Jones, represented by counsel, and a Vocational Expert ("VE") testified before an ALJ on April 26, 2023. (Tr. 34-63). On July 18, 2023, the ALJ issued a written decision finding Jones not disabled. (Tr. 12-33). The Appeals Council denied his request for review on September 14, 2023, making the hearing decision the final decision of the Commissioner. (Tr. 1-6).

On April 12, 2024, the case was remanded to the Commissioner by this Court, based upon the parties' joint stipulation. (Tr. 907-09). Accordingly, a second hearing was held before the ALJ on December 9, 2024, where Jones (with new representation) and a different VE testified. (Tr. 846-72). The ALJ then issued a written decision on January 3, 2025, again finding Jones not disabled. (Tr. 819-39). Jones timely filed this action on May 1, 2025. (ECF Doc. 1).

## III.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Jones was born July 27, 1979. (Tr. 837). He was 40 years old on his alleged onset date of October 9, 2019, making him a younger individual according to agency regulations. (Tr. 175). His date last insured ("DLI") was September 30, 2025. (Tr. 824). He has at least a high school

education. (Tr. 837). He has past relevant work as a solderer assembler, DOT #813.684-014, SVP 4, medium exertional level. (*Id.*).

**B.    Relevant Medical Evidence**

A review of the medical records reveals that on October 16, 2018, Jordan was assessed with a right hip mixed type femoral acetabular impingement, an acetabular labral tear, intraarticular loose bodies, and a large chondral flap at the superior acetabulum. (Tr. 280). He underwent a right hip arthroscopy with arthroscopic rim trim, subspinous decompression, intraarticular loose body removal, acetabular labral repair, femoral osteochondroplasty for CAM lesion and capsular plication. (*Id.*). At subsequent followup visits in November and December, 2018, his right hip was showing improvement. (Tr. 295, 297). A bilateral hip MRI on December 3, 2018 showed post-surgical changes in the right hip, but also showed CAM morphology of the left femoral neck and a small anterior acetabular labral tear. (Tr. 315-16).

On January 14, 2019, Jordan reported that his right hip was doing well, but he had soreness with extended periods of sitting or when working ten hour shifts. (Tr. 299). He also was reporting increasing left hip pain. (*Id.*). His physician assistant provided him a note for his employer limiting him to eight hour shifts. (*Id.*). On April 8, 2019, Jones met with his internist at the VA, Carolyn Kuerbitz, who indicated that the deformity in his left hip was similar to that in his right, and he would likely require the same surgical procedure on the left hip. (Tr. 581). Dr. Kuerbitz also referred him for a steroid injection to address pain in his left shoulder, and noted that he was having increasingly frequent headaches that may have been related to an incident in 2004 where he was assaulted and lost consciousness, or one in 2016 where he hit his head and suffered severe headaches for several days. (*Id.*).

On April 11, 2019, Jones attended a traumatic brain injury ("TBI") consultation. (Tr. 573-77). There, he reported daily headaches with memory problems for several weeks, where the headaches used to occur only two to three times monthly. (Tr. 574-75). The headaches caused photophobia, nausea and some dizziness, and he was also complaining of difficulty maintaining sleep, irritability, tinnitus and intermittent hearing difficulty. (Tr. 575). He was assessed with a mild TBI/concussion, with symptoms most likely due to mental health/readjustment issues, stress/anxiety and poor sleep. (Tr. 576). His prognosis was seen as "very good". (*Id.*).

Jones met with mental health clinician Dale Slivka, LISW-SUPV, on June 6, 2019, to whom he reported he had recently remarried, retired from the military and quit his civilian job. (Tr. 564). While he had not had panic attacks in almost a month, he was reporting mental health symptoms including decreased energy and motivation, fluctuating appetite and disturbed sleep. (*Id.*). At a subsequent mental health visit on December 16, 2019, he reported that his stress had decreased becaused he had resolved his divorce and graduated from college. (Tr. 548). He had experienced a recent panic attack, and his clinician thought he might benefit from evidence based therapies. (*Id.*).

At a July 1, 2019 office visit Jordan complained of worsening hip pain despite attending physical therapy and using anti-inflammatories, and, given the benefits he realized with his right hip surgery, asked to undergo left hip surgery. (Tr. 303). He then underwent a similar procedure to his left hip on August 28, 2019. (Tr. 283).

At an October 2, 2019 visit with his physician assistant, Kristi Slabe, PA-C, Jordan indicated that his left hip was doing "really well" but he was experiencing some pain in the right hip. (Tr. 308). By December 11, 2019 his improvement had continued to the point he was contemplating getting "back into some running," though PA Slabe recommended "eas[ing] back

in as his hips would tolerate." (Tr. 310). On March 11, 2020, while Jones reported he was "generally great" and had full range of motion and no pain in the left hip, he was having posterior lateral pain in the right hip with tenderness to palpation of the gluteal muscles and over the peritrochanteric space. (Tr. 312) A right hip and pelvis x-ray showed a CAM type deformity of the right femoral head-neck junction suggestive of a femoroacetabular impingement and transitional vertebra with partial sacralization of L5 on the right. (Tr. 317-18). He received a lidocaine and Depo-Medrol injection into the right peritrochanteric space. (Tr. 312).

On July 21, 2020, Jones was assessed for his ability to perform activities of daily living ("ADLs"). (Tr. 622-26). The physical therapist, Christoper Wood, noted that Jones was showing signs and symptoms of soft tissue of the deep right hip rotators and a L4 lumbar radiculopathy on the right with only mild limitations in strength and flexibility. (Tr. 626). He was capable of performing all ADLs without assistance. (*Id.*). Throughout 2020 he was in physical therapy. (Tr. 493-500, 513-29).

On December 9, 2020, Jones had an MRI that showed a left annular tear at L1-L2, disc dessication with mild disc bulge at L3-L4, mild disc bulge with facet degeneration with bulging disc indenting the exiting nerve root in the lateral recesses bilaterally at L4-L5, and mild bilateral neural foramen compromise from bulging disc at L4-L5. (Tr. 473). On January 11, 2021, Jones told his physical therapist that he felt he had returned to work too quickly after his hip surgeries which resulted in his ongoing right hip and lower back pain. (Tr. 485). He reported lower back pain when driving or standing for extended periods, and he was experiencing burning in his left lateral hip that radiated down his leg. (*Id.*).

On May 27, 2021, Jones attended a psychiatric consultation seeking a recommendation from the VA to attend programming at the Shepherd Center, seemingly to address issues related

to a TBI arising from being assaulted in 2003. (Tr. 458). He was interested in the Shepherd Center program because of its "veteran-centric multi-disciplinary" approach. (Tr. 459).

On June 16, 2021, Jones was referred to the SHARE Military Initiative day program for evaluation of his symptom related to TBI and PTSD. (Tr. 410). He reported symptoms including monthly bifrontal and bitemporal headaches with sharp throbbing pain; decreased short and long term memory; easy distraction and irritability with over-stimulation; decreased mood; significant anxiety triggered by being in public, noise, commotion and disagreement with others; panic attacks; anger; tunnel vision; racing thoughts, sweating; palpitations; tinnitus; imbalance; and, dizziness.  (Tr. 410-11). Jones was assessed with a mild TBI, headaches/migraines, insomnia, cognitive difficulties, imbalance/dizziness, depression and anxiety with panic attacks. (Tr. 418). On November 3, 2021, he was also diagnosed with PTSD. (Tr. 447).

At a VA intake assessment performed on July 16, 2021, Jones noted that he was anxious, on guard, alert, short-term memory impaired, with broken sleep, low energy and low motivation. (Tr. 682). He noted a history of depression with passive suicidal ideations, most recently within that year. (*Id.*). He was assessed with symptoms of depression, anxiety, anger, difficulty with stress management, home discord, hypervigilance, hyperstartle and difficulty connecting with civilians. (Tr. 689).

On November 4, 2021, Jones presented to his physical therapist, Christopher Wood, for a functional assessment. (Tr. 441-46). There he reported constant lumbar pain and bilateral hip pain worse on the right. (Tr. 442). He noted that the pain will radiate to the right posterior lateral aspect of the lower extremity to the plantar surface of the right foot on occasion. (*Id.*). The foot occasionally goes numb, and he experiences constant gluteal and groin pain. (*Id.*). His pain is worse with weight-bearing or if he sits for more than 25 minutes. (*Id.*). His range of motion was

within normal limits, and his strength was 5/5 throughout. (Tr. 443). He was assessed with right

sided S1 radiculopathy, consistent with his most recent MRI, and bilateral labral pathology. (Tr.

446).

At a psychiatry consultation on May 5, 2022, Jones reported that he was sleeping well,

that he was active in painting his church and baking, that his mood was stable, and that he was

"doing amazing in managing my pain." (Tr. 358). He denied helplessness, hopelessness and

suicidal ideations, and stated that he was in training to be a robotic's coach at his son's school.

(*Id.*). In consultation with his psychiatrist, Jones decided to decrease the dosage of his

psychological medications with the option of discontinuing. (Tr. 359). On August 24, 2022,

Jones' wife was approved for the Program of General Caregiver Support Services through the

VA, due to her role as his "emotional support and assistance" provider. (Tr. 356-57).

On August 11, 2022, Jones had x-rays done on his lumbar spine, pelvis and right hip. (Tr.

662-63). The lumbar x-ray revealed moderate disc space loss at L5-S1, leading to an impression

of lumbosacral arthritis, a component of which may have been accentuated by transitional

segmentation. (Tr. 663). The pelvic and right hip x-ray showed minimal superior hip joint

reduction leading to an impression of minimal right hip arthritis. (Tr. 662).

At a psychiatric consult on May 15, 2023 Jones stated that he had been fired from his job

at a pre-school for using physical means to discipline an unruly child, although when he was

shown video of the incident, he did not remember it happening as it appeared, and felt he had

been triggered by the child. (Tr. 1091). At a consult on May 10, 2024, Jones reported hy was

working part-time at the YMCA and that he and his wife had restarted their travel agency. (Tr.

1049). He denied any active mood symptoms, and was considering discontinuing his Cymbalta.

(*Id.*).

7

### C.      State Agency Reviewing Opinion Evidence

On June 29, 2022, state agency reviewing psychologist Karla Delcour, Ph.D., opined that Jones had a mild limitation in the domains of social interaction; concentration, maintaining pace and persistence; and adapting and managing oneself. (Tr. 69). She further determined Jones had moderate limitations in his ability to carry out detailed instructions; his ability to maintain attention and concentration for extended periods; his ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; his ability to interact appropriately with the general public; and, his ability to respond appropriately to changes in the work setting. (Tr. 72).

On November 1, 2022, Kristen Hoskins, Psy.D., adopted all of Dr. Delcour's findings on reconsideration but found additional moderate limitations in Jones' ability to accept instructions and respond appropriately to criticism from supervisors; and his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (Tr. 97-99).

On August 16, 2022, state agency reviewing physician Mehr Siddiqui, M.D., opined that Jones was limited to light exertion, with the additional restrictions limiting him to occasional climbing of ramps and stairs; never climbing ladders, ropes or scaffolds; frequent balancing; occasional stooping, kneeling, crouching or crawling; and, avoiding even moderate exposure to unprotected heights and hazardous machinery. (Tr. 71-72). Dr. Siddiqui's opinion was affirmed on reconsideration by Venkatachala Sreenivas, M.D., on November 1, 2022. (Tr. 96-97).

### D.      Consultative Examiner Opinions

On July 7, 2020, consultative examiner Bryan Krabbe, Psy.D, diagnosed Jones with
Major Depressive Disorder; Unspecified Anxiety Disorder; and Unspecified Alcohol-Related
Disorder, in sustained remission. (Tr. 335). Dr. Krabbe opined that Jones had described
symptoms that could result in increased worry and a corresponding decrease in attention and
concentration. (*Id.*). He further determined that Jones may have mental instability when
presented with critical supervisory feedback and that he may have trouble developing and
maintaining co-worker relationships. (Tr. 336). Finally, he found that work pressure may lead to
emotional instability and withdrawal. (*Id.*).

On August 11, 2022, Jones attended a physical consultative examination with Dorothy
Bradford, M.D. (Tr. 666-72). Dr. Bradford noted that Jones had undergone bilateral surgical
procedures in 2018 and 2019 to address "misshapen hips," that he experienced lower back pain
that had improved through physical therapy and chiropractc care, that he had experienced left
shoulder pain that improved with cortisone shots, and that he experienced headaches and
forgetfulness relating to a TBI he had suffered in 2003. (Tr. 666-67). Dr. Bradford diagnosed
Jones with mild degenerative joint disease of the right hip and opined that he was capable of
performing sedentary activity. (Tr. 667).

### E.      Treating Source Opinions

On July 21, 2020 Supervisory Physical Therapist Christopher Wood found, and Carolyn
Keurbitz, Internist, co-signed, that Jones "is fully capable of performing all ADL/IADLS without
assist." (Tr. 626). On November 4, 2021, SPT Wood performed a functional assessment of Jones,
with his findings co-signed by physician George Knappenberger. (Tr. 442-46). SPT Wood found
that Jones tested into a sedentary work category but that he was limited to frequent reaching

overhead; occasional trunk rotation, stooping, squatting, climbing of ramps and stairs; that he could have limited exposure to moving mechanical parts, operating a vehicle, humidity and wetness, dust/odors/fumes/pulmonary irritants, and extreme heat; and that he should avoid unprotected heights, extreme cold and vibrations. (Tr. 444-46).

Although he would not be recognized as a treating medical source, in response to a Physical Residual Functional Capacity Questionnaire submitted on November 10, 2021, SPT Wood indicated that pain would occasionally interfere with Jones' attention and concentration, but that he was capable of performing low stress jobs. (Tr. 786). Jones was capable of walking one or two city blocks; could sit 20 minutes continuously and four hours per workday; could stand five to ten minutes continuously and less than two hours throughout the workday; he would need to walk one to two minutes every 20 minutes, and the ability to alternate between sitting and standing at will; he would need a five to ten minute break every two to four hours; he could lift consistent with the sedentary exertional level; could occasionally twist or stoop; rarely crouch or climb stairs; never climb ladders; and he would be absent two to three days monthly. (Tr. 786-88).

SPT Wood also responded to a Medical Impairment Questionnaire Regarding Illnesses, Physical Abilities and Limitations on April 11, 2023 by suggesting Jones was capable of standing 0-15 minutes and sitting 30 miutes at one time; that he could work one to two hours per workday; that he could lift consistent with a sedentary exertional level; that he could occasionally bend or balance but never stoop; that he could frequently manipulate with his left hand or reach overhead; that his pain was moderate-severe depending on activity and position; that he would be off-task more than 25% of the time, and be absent three to four more times per month. (Tr. 780-81).

On October 5, 2021, in response to a Medical Source Statement of Ability to do Work-Related Activities (Mental) questionnaire, Dietrich Schelzig, M.D., indicated that Jones would have slight restrictions on his ability to understand, remember and carry out detailed instructions; to make judgments on simple work related decisions; to interact appropriately with the public, supervisors and co-workersl to respond appropriately to work pressures in a usual work setting an to changes in a routine work setting. (Tr 789-90). He would also be "periodically impaired" with punctuality/attendance. (Tr. 790).

On March 21, 2023, in response to a Mental Impairment Questionnaire, Dr. Schelzig opined that Jones would be off-task 15% of the time and absent more than three times monthly. (Tr. 782). Dr. Schelzig found that Jones was moderately limited in his ability to complete tasks in a timely manner; to ignore or avoid distractions while working; and to work a full day without needing more than the allotted number or length of rest periods. (Tr. 783). Dr. Schelzig opined that Jones was moderately limited in social interactions and concentration, persistence and maintaining pace and mildly limited in understanding, remembering and carry out taks and adapting and managing oneself. (Tr. 784).

Finally, on November 13, 2024, in response to the same questionnaire, Dr. Schelzig indicated Jones would be off-task 15% of the time and absent one or fewer times monthly; that he had moderate limitations in all areas questioned under concentration, persistence and maintaining pace as well as in his ability to adapt to changes and manage his psychologicaly based symptoms. (Tr. 1010-11). Dr. Schelzig found that Jones had mild limitations in understanding, remembering and carrying out tasks, with moderate impairments in social interactions; in concentration persistence and maintaining pace; and adapting and managing oneself. (Tr. 1012). Finally, he opined that Jones was capable of performing regular, full-time,

competitive employment without being absent more than twice monthly, being off-task more than 15% of the time, or requiring additional breaks. (*Id.*).

>    **F.**      **Administrative Hearing Evidence**

On April 26, 2023, Jones testified before the ALJ that he was capable of driving, and that he had a bachelor's degree. (Tr. 42). It had been about a month since he was terminated from his part-time job as an after-school teacher for physically disciplining a child, although he claims to have been "triggered" by the child. (Tr. 42-43). He had previously worked at TT Electronics, and had served in the military for 21 years. (Tr. 43-44). He is currently receiving retirement pay from the military. (Tr. 45).

Jones testified that he is unable to work because "there's too many mental triggers." (*Id.*). Further, if he has to stand in one place for too long or walk for extended periods, his hips will start to hurt and his back pain will be aggravated. (*Id.*). He is unable to work in any one position for more than 30 minutes. (*Id.*). In his typical day, Jones will help get his kids to school, then go to the YMCA to stretch. (Tr. 46). Throughout the remainder of the day will do random tasks around the house such as doing the dishes or weeding, although he is unable to do much bending. (*Id.*). He also does laundry and volunteers at his church. (Tr. 47). He may accompany his wife to Sam's Club, although he is limited in what he can lift, and the people and the beeping of the tow motors can cause anxiety. (Tr. 47-48). The noise can also trigger his tinnitus. (Tr. 48).

Jones testified he is no longer attending physical therapy for his hips because the VA stopped his referrals. (*Id.*). He does do home exercises he learned in therapy. (Tr. 48-49). He still gets hip pain despite previous surgeries which seems to be worse in the right hip. (Tr. 49). He does see a mental health counselor at the VA on a monthly basis, although he used to see her twice a month. (Tr. 49-50). He feels counseling has been helpful, but he still does not like

dealing with people because he can be triggered and "get kind of worked up." (Tr. 50). He gets along with his family, though he still sometimes loses his cool with them. (Tr. 50-51). He would like to get into woodworking, and has been involved with his son's robotics team. (Tr. 51). He spends time reading his Bible and camping and hiking with his family when he can. (Tr. 52).

Under questioning by his attorney, Jones stated that he randomly has migraines about once a month that tend to last about an hour. (Tr. 52-53). They tend to happen when he is stressed, and will often last until he can lay down in a dark, quiet place. (Tr. 53). He agrees that he can be agitated by people, and noted that when he saw the video of the incident that led to his recent firing he did not really remember what had happened. (Tr. 54). He has had physical confrontations. (Tr. 55). He notes he has bad days at least twice weekly when it is hard for him to even get out of bed. (Tr. 56).

VE Mark Anderson next testified that Jones' past work included electronics tester, DOT #726.261-018, medium exertion, SVP 7, and maintenance repairer, DOT #638.261-030, heavy exertion, SVP 7. (Tr. 58). For her first hypothetical, the ALJ asked the VE to consider an individual of the same age, education and work history as the claimant who could perform work at the light exertional level but could never climb ladders, ropes or scaffolds; occasionally climb ramps or stairs, balance, stoop, kneel and crouch; never crawl; should avoid unprotected heights, commercial driving, and hazardous machinery; should avoid work at a very loud work environment; should avoid extreme cold and extreme heat; should avoid concentrated exposure to vibrations; can understand, carry out and remember simple instructions and routine, repetitive tasks; cannot perform work requiring a specific production rate such as assembly line work; can meet production requirements; allow flexible and goal-oriented pace; maintain the focus, persistence, concentration, pace and attention to engage in such tasks for two-hour increments

for eight-hour workdays within the confines of normal work breaks and lunch periods; can work in a relatively static work environment with no greater than occasional changes; could tolerate occasional interaction with supervisors, coworkers and the general public, and contact includes what is necessary for general instruction, task completion or training; could not perform tandem tasks. (Tr. 58-59). The VE opined that such an individual would be precluded from performing Jones' past work, but could work as a mail clerk, DOT #209.687-026, light exertion, SVP, with 145,000 jobs in the national economy; electronics worker, DOT#726.687-010, light exertion, SVP 2, with 244,000 jobs in the national economy; and inspector/hand packager, DOT #559.687-074, light exertion, SVP 2, with 139,000 jobs in the national economy. (Tr. 59-60).

For her second hypothetical, the ALJ asked the VE to consider an individual with all the same limitations as the first individual, except that they would be limited to sedentary exertion. (Tr. 60). The VE indicated that the individual could work as a patcher, DOT #723.687-010, sedentary exertion, SVP 2, with 182,000 jobs in the national economy; as a touch-up screener, sedentary, SVP 2, with 158,000 jobs in the national economy; and as a table worker, DOT #739.687-182, sedentary exertion, SVP 2, 123,000 jobs in the national economy. (Tr. 60). The VE defined employers' tolerance for time off-task as 15% of an eight-hour work day, and indicated employers will tolerate two absences, tardies or leaving early, or any combination of those, per month. (Tr. 61).

On questioning by Jones' attorney, the VE opined that if a hypothetical individual needed two additional 15 minute breaks taken randomly throughout the day in addition to standard breaks, that would be job preclusive. (Tr. 61-62). The VE further opined that if a hypothetical employee became verbally argumentative with co-workers, supervisors and the general public, he might get one warning, but the second event would lead to termination. (Tr. 62). Finally, the

14

VE noted that employees are generally expected to stay on campus during breaks, and generally there is a cafeteria for that purpose. (*Id.*).

Following the remand ordered by this Court, a second hearing was convened on December 9, 2024. (Tr. 846-72). Here, Jones testified he had most recently worked in August 2024 as a wellness coach at the YMCA, but he quit because he was not metally or physically able to do it. (Tr. 855). He reported he had attempted several different types of employment since his first hearing including opening a travel agency with his wife. (Tr. 857-58). He reported that when he sleeps poorly he tends to cancel all plans for the next day, but he does volunteer once a week at a battered women's shelter doing light maintenance. (Tr. 858). Otherwise he generally stays at home or volunteers at his church. (*Id.*). He recently completed his biblical study certificate. (Tr. 859).

Jones testified he had been assessed with a TBI at the Shepherd Center three or four years prior, but he was not currently undergoing treatment for that condition. (*Id.*). He reports that since he left the military he has trouble establishing and maintaining his own structure. (Tr. 860). He does not have friends he sees outside of his church. (Tr. 861).

Under questioning by his lawyer, Jones testified that his travel agency had only booked six trips since they began, and that his wife had done most of the work. (Tr. 862). He stated that he has good days and bad, and the bad days are more frequent when the weather is cold. (Tr. 863). He noted that when he is active he tends to feel it not only the next day, but even worse the following day as well. (Tr. 864.) He also has bad mental health days where his anxiety and anger are triggered and it will take him several hours to calm down. (Tr. 865). He reports headaches that are stress related "a couple of times a month." (Tr. 866-67).

After Jones' testimony was complete, VE William Braunig testified. (Tr. 867-71). The VE classified Jones' past work as a solderer-assembler, DOT #813.684-014, medium exertion, SVP 4. (Tr. 869). For her first hypothetical the ALJ asked the VE to consider an individual of the same age, education and work history as Jones who could perform work at the light exertional level but never climb ladders, ropes or scaffolds; could occasionally climb ramps or stairs, balance, stoop, kneel or crouch, but never crawl; should avoid unprotected heights, commercial driving and hazardous machinery; should avoid working in a very loud work environment; should avoid extreme cold or heat or concentrated exposure to vibrations; can understand, carry out and remember simple instructions; cannot perform work requiring a specific production rate pace such as assembly line work or an hourly production quota but can meet production requirements that allow flexible and goal oriented pace; can maintain focus, persistence, concentration pace and attention to engage in such tasks for two-hour increments for eight-hour workdays within the confines of normal work breaks and lunch periods; can work at a routine work environment with no greater than occasional changes; and can tolerate occasional interactions with supervisors, coworkers and the general public. (Tr. 869). The VE opined this individual could not perform Jones' past work, but could work as hotel housekeeper, DOT #323.687-014, light exertion, SVP 2, with 179,000 jobs in the national economy; as a merchandise marker, DOT #209.587-034, light exertion, SVP 2, with 137,000 jobs in the national economy; and as a mail sorter, DOT #209.687-026, light exertion, SVP2, with 22,000 jobs in the national economy. (Tr. 870).

For her second hypothetical, the ALJ asked the VE to consider all of the same limitations as the first hypothetical except that this individual would be limited to the sedentary exertional level. (*Id.*). The VE opined that this individual could work as a document preparer, DOT

16

#249.587-014, sedentary exertion, SVP 2, with 15,000 jobs in the national economy; as a ticket checker, DOT #219.587-010, sedentary exertion, SVP 2, with 6,400 jobs in the national economy; and as a printed circuit board inspector, DOT #726.684-110, sedentary exertion, SVP 2, with 2,700 jobs in the national economy. (*Id.*)  The VE testified that employer will tolerate 10% of time off-task and one absence per month. (Tr. 871).

## IV.  The ALJ's Decision

In her decision dated January 3, 2025, the ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2025.

2.  The claimant has not engaged in substantial gainful activity since October 9, 2019, the alleged onset date (CFR 404.1571 *et seq.*and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: lumbosacral arthritis, minimal right hip arthritis, status post bilateral hip surgeries for labral tears, posttraumatic stress disorder, anxiety, and major depressive disorder (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he could never climb ladders, ropes or scaffolds. He could occasionally climb ramps or stairs. He could occasionally stoop, kneel, or crawl. He could never crawl. He could occasionally balance. He should avoid unprotected heights, commercial driving, and hazardous machinery. He should avoid work in a very loud environment. He should avoid extreme cold and extreme heat. He should avoid concentrated exposure to vibrations. He can understand, carry out and remember simple instructions. He cannot perform work requiring a specific production rate pace, such as assembly-line work or an hourly production quota. He can meet production requirements that allow a flexible or goal-oriented pace. He can maintain the focus, persistence, concentration, pace, and attention to engage in such tasks for two-hour increments, for eight-hour workdays, within the confines of normal work breaks and lunch periods. He can work in a routine work environment with

no greater than occasional changes. He could tolerate occasional interactions with supervisors, coworkers and the general public.

6.    The claimant is unable to perform any past relevant work. (20 CFR 404.1565 and 416.965).

7.    The claimant was born on July 27, 1979 and was 40 years old, which is defined as a younger individual age 18-44, on the disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education. (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skill (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, at any time from October 9, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 21-31).

## V.    Law and Analysis

### A.    Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.    whether the claimant is engaged in substantial gainful activity;

2.    if not, whether the claimant has a severe impairment or combination of impairments;

3.    if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.     if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.     if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[1]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

   **B.     Standard of Review**

This Court reviews the Commissioner's final decision to determine whether it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*, quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d

---

[1] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.* Generally, these regulations are duplicates and establish the same analytical framework. For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VI.    Discussion

Jones brings four issues for this Court's review, arguing:

1.    The ALJ's residual functional capacity appraisal reflects legal error and lacks support from substantial evidence secondary to a failure to meaningfully consider and account for the residuals of Plaintiff's traumatic brain injury;

2.    The ALJ's determination reflects legal error and lacks support from substantial evidence secondary to her failure to abide by the regulations governing the consideration of opinion evidence as well as unsupported findings made by the adjudicator in the course of appraising the persuasiveness of the opinion evidence of record;

20

3.    The ALJ failed to abide by the Appeals Council's remand order; and

4.    The ALJ's decision is not supported by substantial evidence and the Commissioner's position is not substantially justified.

(ECF Doc. 6, p. 9).

As Jones' first and third issues are related, I will consider them together. Similarly, I will jointly address Jones' second and fourth issues.

### A.    The ALJ's determination that the Jones' TBI was not severe was supported by substantial evidence.

Jones correctly points out that the basis for remand by this Court on April 12, 2024 pertained to the ALJ's failure to adequately discuss and evaluate Jones' TBI. (ECF Doc 6, p. 10). Jones contends that the ALJ's second decision still failed to properly address the issue of Jones' TBI despite a record that reflects recurrent migraine headaches and other residual impacts of a TBI he suffered during his military service. (*Id.*). Despite treatment and care Jones has received upon referral by the VA, it is Jones' assertion that the ALJ gives "unsustainably short shrift to this impairment," providing no meaningful explanation of how his TBI and related symptoms factored into the ALJ's RFC determination. (*Id.* at p. 11). In Jones's view, this deficiency worked to his detriment, as restrictions in the RFC relating to this condition may have been disabling based upon the VE's testimony concerning additional breaks and absenteeism. (*Id.* at p. 12).

The Commissioner counters that the ALJ reasonably determined Jones' TBI was not a severe impairment under 20 C.F.R. § 404.1521. (ECF Doc. 8, p. 7). The Commissioner notes that the TBIs allegedly occurred in 2000 when Jones experienced gunfire while deployed in the South China Sea, and when he was assaulted in 2003. (*Id.*). In the first instance, Jones continued working; he was placed on limited duty for one week following the second. (*Id.*). While Jones did receive treatment for the TBIs in 2021 at the Shepherd Center, he met the majority of his

goals in occupational and speech therapy, and experienced decreased symptoms. (*Id.* at p. 8). The Commissioner argues that the ALJ thoughtfully considered Jones' TBI, noting in particular that Jones experiences no more than one headache per month, and has had generally unremarkable examinations. (*Id.*). The significant question is whether the ALJ considered functional limitations resulting from the claimant's impairments, and, in the Commissioner's view, she provided substantial evidence to support her decision. (*Id.*).

The ALJ consideres the severity of a claimant's impairments at Step Two of the sequential evaluation. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is not considered severe if it does not "significantly limit [one's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1522(a). The claimant bears the burden of demonstrating that he suffers from a medically determinable impairment. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). The Sixth Circuit has construed Step Two as a *de minimis* hurdle intended to "screen out totally groundless claims." *Kestel v. Comm'r of Soc. Sec.,* 756 F. App'x. 593, 597 (6th Cir. 2018). Where an ALJ determines that one (or more) of a claimant's impairments is severe, the ALJ then proceeds to consider the "limitation and restrictions imposed by all of an individual's impairments, even those that are not 'severe'". *Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007). Thus, because an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, any perceived failure to "find additional severe impairments at step two '[does] not constitute reversible error." *Id.*, quoting *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

Here, the ALJ provided a thorough analysis of Jones' TBI, as required by the Appeals Council order, writing:

> The claimant reported an incident in 2000 where he experienced over one hour of gunfire while deployed in the South China Sea (Ex. 6F/3). Following this, he felt

"off" with tinnitus, chest pain, nausea and dizziness for a few days. He continued working throughout that time (Ex. 6F/3). In 2003 he was stationed in San Diego and was assaulted in the community, when he was hit on the head and knocked out. He lost consciousness for a few minutes and treated in the emergency room for a broken nose and headaches. He was placed on limited duty for one week. He complained of ongoing headaches, distraction, and being easily irritated by stimulation and was referred to initiate treatment at the Shepard Center (*sic*) (Ex. 6F/8). The claimant was treated at the Shepherd Center from June 14, 2021 to July 13, 2021 (Ex. 6F) He was discharged early due to a family emergency. He had met recreation therapy goal of horticulture (indoor gardening) but did not meet the remaining goals due to early discharge, and discharge testing could not be completed due to the early discharge. He was noted to have been making good progress during his admission. He had met two out of three long-term goals in occupational therapy. He reported through strategies and home exercise completion, symptoms had decreased with computer use. In speech language pathology, he demonstrated good progress and met four out of four short term goals. In physical therapy, he had not met goals and discharge testing was not completed due to early discharge. The claimant later stated his traumatic brain injury manifested only as one headache per month. The claimant testified he had not received treatment for traumatic brain injury since this program. Therefore, the undersigned finds that the traumatic brain injury is non-severe. The undersigned considered all the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity.

(Tr. 825).

Clearly, the ALJ articulated substantial evidence that supported her determination that the TBI was not a severe impairment, including the remote nature of the injury, the treatment he has received to address the injury, and the limited ongoing symptoms he endures. (*Id.*). More importantly, even had she not, she indicated that she took into account all impairments, severe or not, when assessing Jones' RFC. Because the ALJ considered these impairments in the remaining disability analysis,  it is unnecessary to determine whether the ALJ erred in classifying Jones' TBI as non-severe at Step Two. *Fisk*, 253 F. App'x at 584, citing *Maziarz*, 837 F.2d at 244); *see also Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 ("[E]ven if the ALJ erred at step two, the ALJ's consideration of the cumulative effect of [the claimant's] impairments (both severe and non-severe) throughout the remaining steps of the analysis rendered any error

23

harmless."); *Kirkland v. Comm'r of Soc. Sec.*, 528 F. App'x 425, 427 (6th Cir. 2013) ("[S]o long as the ALJ considers all of the individual's impairments, the failure to find additional severe impairments . . . does not constitute reversible error.") (internal quotation marks and citations omitted); *Hedges v. Comm'r of Soc. Sec.*, 725 F. App'x 394, 395 (6th Cir. 2018) (per curiam) (holding that once the ALJ had found at least one severe impairment and considered the limiting effects of all impairments, "whether the ALJ characterized [the claimant's] mental-health impairments as severe or non-severe at step two [was] legally irrelevant and [did] not amount to error" (internal quotation marks omitted)).

As the ALJ properly considered all of Jones' impairments when determining his RFC, with specific attention paid to his TBI, she complied with the mandate of the Appeals Council order. The ALJ provided substantial evidence in support of her determination that the TBI was non-severe. Further, even if she had erred in finding the TBI non-severe, that error would have been harmless, as she considered both severe and non-severe impairments when establishing Jones' RFC. Accordingly, I cannot recommend remand on this issue.

**B.      The ALJ's evaluations of the expert medical opinion evidence was supported by substantial evidence.**

**1.      The ALJ properly evaluated SPT Wood's opinions.**

Jones argues that the ALJ, despite a mandate from the Appeals Council, failed to account for SPT Wood's opinion that Jones' conditions "are likely to produce both good and bad days, which may lead to increased number of call offs." (Tr. 913, citing Tr. 446). Jones further contends that while the ALJ acknowledged the similarities in the opinions of PT Wood and Dr. Schelzig, Jones' mental health care provider, with regard to time off-task and absenteeism, her decision is insufficiently specific when writing that those two opinions are "inconsistent with the rest of the record." (Tr. 834). According to Jones, the ALJ does not properly articulate the

specific medical records, examination findings or test results that undermine SPT Wood's opinion. (ECF Doc 6, p. 14). Jones further argues that the ALJ's reliance on his activities to show he is capable of maintaining acceptable levels of time off-task and absenteeism ignores context for those activities, thereby painting an inaccurate picture of his capabilities. (*Id.* at p. 15). Specifically, Jones challenges the ALJ's reliance on his work toward a degree, his volunteer work at his church, his part-time jobs, and his effort to start a travel agency with his wife, as support for his ability to attend to tasks and limit absenteeism. (*Id.* at pp. 15-17).

The Commissioner counters that the ALJ properly explained that SPT Wood's opinions were not fully supported by the evidence from his own treatment notes, and were inconsistent with other medical records. (ECF Doc. 8, p. 9). In the Commissioner's view, the ALJ provided ample explanation that the record did not support SPT Wood's opinion that Jones would be unable to work a full day, would be off task excessively, or would have excessive absenteeism. (*Id.*). Further, the Commissioner argues the ALJ's reliance on Jones' activities for this determination was appropriate, and Jones' argument that the activities in question were intermittent amounts to a prohibited request for a *de novo* review of the evidence by this Court. (*Id.* at p. 10).

An RFC determination is a legal finding, not a medical determination; it is thus for an ALJ – not a physician – to determine a claimant's RFC. *Nejat,* 359 F. App'x at 578 ("Although physicians opine on a claimant's residual functional capacity to work, [the] ultimate responsibility for capacity-to-work determinations belongs to the Commissioner."); *see also* 20 C.F.R. 404.1546(c)("[T]he administrative law judge . . . is responsible for assessing your residual functional capacity.") Even if an ALJ finds an opinion wholly persuasive, "an ALJ is not

necessarily required to adopt wholesale limitations contained therein." *Harris v. Comm'r of Soc. Sec.*, No. 1:13-cv-00260, 2014 WL 346287, *11 (N.D. Ohio Jan. 30, 2014).

An ALJ is no longer obligated to give "good reasons" for not adopting a consultant's opinion as written. *Cf.* 20 C.F.R. § 404.1527(c)(2). Instead, the ALJ's only articulation duty is to describe "how [she] considered the medical opinions" and "how persuasive [she] find(s) all of the medical opinions." 20 C.F.R § 416.920c, *see also Gamble v. Berryhill*, No. 5:16-CV-2869, 2018 WL 1080916, *5 (N.D Ohio Feb. 28, 2018). Factors to be considered include: (1) Supportability; (2) Consistency; (3) Relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) Specialization; and (5) other factors. 20 C.F.R. § 416.920c. Supportability and consistency are considered the two "most important" factors; therefore, the regulations dictate that the ALJ "will explain" how the supportability and consistency factors were considered. 20 C.F.R. § 416.920c.

With regard to SPT Wood, the ALJ directly addressed the consistency factor, noting that his opinions were "somewhat consistent with the opinions of Dr. Bradford and Dr. Schelzig." (Tr. 834). The ALJ added that "[a]lthough the time off task and absences portion of the opinion are supported by the opinions of Dr. Schelzig, both of those portions are inconsistent with the rest of the record, including the claimant's activities of going to school to get a degree, volunteering, working a number of part-time jobs, even two at one time, and starting a travel agency." (*Id.*). She also wrote:

> The record does not support that the claimant could not work a full day or have excessive absences, as reflected in his daily activities and examinations. Mental status exams described above do not support time off task. Physical examinations other than the functional capacity evaluations do not support upper extremity limitations. These opinions reflect more limits than supported by the record, such as reaching and pulmonary irritants.

(*Id.*). Thus, the ALJ clearly considered consistency when evaluating SPT Wood's opinions, and articulated how she determined his opinions to be only partially persuasive.

Similarly, the ALJ went to great lengths to address supportability. While the ALJ noted that Jones' range of motion in the hips was limited during a November 2021 evaluation, she also noted that at an August 2022 visit, his "examination findings were normal with normal strength in all muscle groups and normal range of motion of all joints. He had no joint effusions. He had a normal gait. There was mildly decreased strength and rotation of motion on the right." (*Id.*). At a May 2022 follow up, he had also reported his mood was stable, he was sleeping well, he was able to control his pain, and he was active in his church, painting, and baking. (*Id.*). These findings supported limiting the claimant to a reduced range of light exertional work, as opposed to the restrictions suggested by SPT Wood's opinion. (*Id.*). As supportability, like consistency, was clearly addressed, the ALJ met her burden of articulating how she evaluated the medical opinions, and cited substantial evidence in doing so. Any determination to the contrary would require a re-weighing of the evidence, an exercise outside of this Court's purview.

## 2. The ALJ properly evaluated Dr. Schelzig's opinion.

Jones also alleges error in the ALJ's evaluation of Dr. Schelzig's opinions. (ECF Doc. 6, pp. 18-20). Jones notes that the Appeals Council highlighted errors in the ALJ's first consideration of Dr. Schelzig's opinion that indicated Jones would be absent more than 3 times monthly and off task more than 15% of a work week. (*Id.* at p. 18). Following that remand, Dr. Schelzig offered a new opinion in November 2024, opining that Jones would be off task 15% of the time, and absent once per month. (*Id.*). Jones asserts that the ALJ neglected this new opinion in her evaluation, meaning that she failed to consider the changes in Dr. Schelzig functional assessment over time which would have appeared to coincide with the ALJ's own assessment

and rendered the opinions persuasive. (*Id.*). Jones also takes exception with the ALJ's contention that his travel agency was "a good business", and, as such, negatively impacted the supportability of Dr. Schelzig's opinion. (*Id.* at pp. 18-19). Finally, Jones argues the ALJ erred in finding that notations of "moderate limitation in any area of mental functioning" is inconsistent with Dr. Schelzig's opinions on time off-task and absenteeism. (*Id.* at p. 19).

The Commissioner argues that the notion that the ALJ neglected the November 2024 opinion was merely a Scrivner's error, as she failed to specifically list it among the three opinions rendered by Dr. Schelzig that he considered. (ECF Doc. 8, p. 11). The ALJ, however, cited directly to the November 2024 opinion in her decision, clearly indicating that it had been considered. (*Id.*). The Commissioner further asserts that the argument concerning Jones' travel agency should be rejected because it was but one of a litany of factors that the ALJ enumerated in her determination that Dr. Schelzig's opinions were only "somewhat persuasive." (*Id.*). The Commissioner points out that the ALJ also considered numerous mental health evaluations conducted by Dr. Schelzig that showed mostly innocuous findings and symptoms; that Jones was sleeping well and was actively volunteering in his church; that he was "doing amazing handling his pain"; that he was starting training to coach his son's robotics team; that he was pursuing a certificate in Christian education; and that Dr. Schelzig's opinions were inconsistent with other medical evidence. (*Id.* at pp. 11-12).

Applying the standard noted above for an ALJ's evaluation of medical opinion evidence, the ALJ here again met her burden in evaluating Dr. Schelzig's three opinions. With regard to supportability, she noted that Dr. Schelzig's treatment notes do not support that Jones would be excessively absent or off-task, as he recorded on May 10, 2024 that Jones would "no longer [require] specialty mental health care due to his adherence with medications, and he would be

28

followed by his primary care doctor for mental health." (Tr. 836). One of his medications, duloxetine, had been discontinued due to his improvement. (*Id.*). Further, the ALJ noted that Dr. Schelzig's opinions, in her view, were internally inconsistent, as he found only moderate limitations in all areas of mental functioning, a finding inconsistent with excessive absenteeism or time off-task. (*Id.*). The ALJ also addressed consistency, writing that his opinions were consistent with SPT Wood regarding time off-task and absenteeism (Tr. 834), and generally consistent with state agency psychological consultants (Tr. 836). While it may be fair to question whether the travel agency was "a good business", this does not diminish the articulation of the ALJ's assessment to the point that it countenances remand. The ALJ built a logical and accurate bridge to the record showing how she evaluated Dr.Schelzig's opinion, supported by substantial evidence, and accordingly met her burden.

### 3.     The ALJ properly evaluated the opinion of the consultative examiner, Dr. Krabbe.

Jones argues that the ALJ failed to explain how Dr. Krabbe's opinion was lacking in consistency and supportability. (ECF Doc. 6, p. 20). The ALJ's determination that Dr. Krabbe's opinion is "vague" fails to pass muster, in Jones' view, because it lacks the specificity necessary to meaningfully review the ALJ's reasoning. (*Id.*). Jones contends Dr. Krabbe's opinion is in effect consistent with Dr. Schelzig's opinion with regard to time off-task and absenteeism, and also consistent with Jones' own allegations of disabling symptoms. (*Id.* at p. 21). Accordingly, the evaluation of Dr. Krabbe's opinion demands further consideration. (*Id.*).

The Commissioner retorts that substantial evidence supports the ALJ's determination that Dr. Krabbe's opinion was only somewhat persuasive. (ECF Doc. 8, p. 12). The Commissioner argues that while the ALJ did not specifically use the word "supportability", she was not required to so, and there was adequate discussion of these factors in the decision. (*Id.* at p. 13). Further,

the Commissioner contends there is no error in the ALJ's determination that Dr. Krabbe's

opinion is "somewhat vague" with no specific limitations given, and those limitations that are

provided are based only on Jones' own statements, rather than the examination. (*Id.*). Where, as

here, a limitation suggested in the opinion is couched with the word "may," it is not an

affirmative finding, and therefore not an actual medical opinion. (*Id.*).

Here, again, the Commissioner has the better of the argument. As the ALJ noted, Dr.

Krabbe's opinion indicated that Jones' mental health symptoms *may* decrease attention and

concentration and *may* impact his ability to respond to critical supervisory feedback and maintain

appropriate co-worker relationships. (Tr. 836, emphasis added). Jones *may* also have difficulty

responding to work pressures due to emotional instability and withdrawl. (*Id.*, emphasis added).

In evaluating Dr. Krabbe's opinion the ALJ wrote:

> The undersigned finds the opinions of Dr. Krabbe somewhat persuasive. They are
> generally supported by subjective signs and findings upon examining the claimant
> and consistent with the state agency psychological consultant. For example, Dr.
> Krabbe noted that the claimant was cooperative, and rapport was adequately
> established. Grooming was adequate, the claimant put good forth good effort, and
> speech was normal. There were no signs of anxiety or emotional disturbances.
> Intellectual functioning was within normal limits, and testing demonstrated
> adequate concentration and memory. Judgment was sufficient and insight adequate.
> However, the conclusions of Dr. Krabbe are somewhat vague, no specific
> limitations were given, and many potential limitations, as designated using "may,"
> were based on the claimant's report and not the examination. The mental residual
> functional capacity is consistent with the objective and subjective evidence of
> record.

(*Id.*).

The ALJ, in finding Dr. Krabbe's opinion "somewhat persuasive" clearly addressed the

factor of consistency, explicitly determining that Dr. Krabbe's opinion was consistent with that

of the state agency psychological consultant. (*Id.*). The ALJ also found that Dr. Krabbe's

opinions were "generally supported by objective signs and findings upon examining the

claimant," noting in particular that Jones was cooperative, rapport was easily established, he

showed no signs of anxiety or emotional disturbance, his intellectual functioning was within normal limits, and his concentration and memory were adequate. (*Id.*). There is a clear, logical and adequate bridge to show exactly how the ALJ arrived at her conclusions regarding Dr. Krabbe's opinion. Further, the ALJ's determination that the opinion is "somewhat vague" with no specific limitations given and designating any limitations in the opinion as issues that "may" arise, is an appropriate consideration. *See Nolcox v. Berryhill*, 2019 WL 1331582, *9. (N.D. Ohio Mar. 25, 2019) (finding no error in the ALJ's decision relying on the state agency reviewers' opinion except for the portion that indicated the claimant "may" require flexibility due to anxiety; "To treat the *possible* limitations floated by [the state agency reviewers] as an affirmative finding that the need for flexibility in shifts was mandated would improperly alter the contents of the medical source's opinion") (emphasis in original)). The uncertainty surrounding the restrictions Dr. Krabbe notes in his opinion renders it unclear what impact those restrictions may have on Jones' residual functional capacity, and accordingly, it was not error for the ALJ to find Dr. Krabbe's opinion only somewhat persuasive on that basis, and to omit those restrictions from the RFC.

> **4.** **The ALJ properly evaluated the Prior Administrative Medical Findings (PAMF's) of the state agency reviewing psychologists.**

With regard to the opinions of state agency reviewing psychologists, Drs. Delcour and Haskins, Jones argues again that the ALJ did not meaningfully address the factors of supportability and consistency in her decision. (ECF Doc. 6, p. 21). Per Jones, the ALJ further failed to define the concept of "vocationally relevant terminology" which is notable as the RFC inlcudes seemingly "vague terms." (*Id.* at p. 22). The RFC also appears to exclude limitations from the doctors' opinions without appropriate explanation. (*Id.*). Specifically, the ALJ does not

account for restrictions opined by the experts such as working only in a "non-crowded environment" and limiting Jones to complete "short cycle work tasks." (*Id.* at pp. 22-23).

The Commissioner counters that substantial evidence supports that the PAMFs were generally persuasive, and that the ALJ properly addressed the issues of consistency and supportability. (ECF Doc. 8, p. 14). While the Commissioner agrees that the ALJ did convert the PAMFs into "vocational relevant terminology," he asserts that doing so for purposes of clarity is not error. (*Id.* at p. 15). The Commissioner finally argues that the ALJ properly accounted for restrictions such as "short cycle work tasks" and "non-crowded environment" in the RFC, albeit while utilizing different language, which is not error as the ALJ is not required to recite the medical opinion of a physician verbatim in the RFC finding. (*Id.* at pp. 15-16, citing *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009)).

In evaluating the PAMFs, the ALJ found the opinions to be:

> generally persuasive as they are supported by the evidence that the clamiant has mild limitations in the ability to understand, remember or apply information and moderate limitations in the ability to interact with others, concentrate, persist or maintain pace, and adapt or manage himself and they are generally consistent with the opinions of Dr. Krabbe.

(Tr. 835). The ALJ noted that the mental residual functional capacity is "provided in somewhat more vocationally relevant terminology." (*Id.*). The ALJ then referred to examples throughout the treatment records that instructed her determination of the RFC, including documentation of coherent and linear thought process; Jones studying to obtain certification to teach pre-school; records generally documenting good eye contact, normal speech and coherent; rapid speech and restricted affect; down mood and low energy; and documentation of good hygiene, fair to good insight and judgment, though insight was limited at times. (*Id.*). These factors provided support for the opinions of the PAMFs, and this, along with consistency with the consultative examiner's

opinion, provided the basis for finding the PAMFs to be generally persuasive. This discussion in the ALJ's decision comports with the requirements detailed above in how expert opinions are to be evaluated, and therefore does not indicate that remand would be appropriate.

As to Jones' argument that the ALJ inappropriately converted the language in the PAMFs to vocationally relevant terminology in the RFC, as a general matter, an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding." *Poe*, 342 F. App'x at 157. Even where an opinion is found persuasive, the Sixth Circuit has noted "there is no requirement that an ALJ adopt a state agency psychologist's opinion[ ] verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015); *see also Moore v. Comm'r of Soc. Sec.*, No. 1:13-CV-00395, 2013 WL 6283681, *7-8 (N.D. Ohio Dec. 4, 2013) (finding ALJ who gave great weight to an opinion was not required to incorporate all limitations from that opinion).

Converting limitations "into vocationally relevant terms," can be a necessary tool before an ALJ poses a hypothetical limitation to a vocational expert. *See Modro v. Comm'r of Soc. Sec.*, No. 2:18-CV-900, 2019 WL 1986522, at *7 (S.D. Ohio May 6, 2019) (finding ALJ "reasonably converted and incorporated" medical opinions "into vocationally relevant terms in Plaintiff's RFC"), *report and recommendation adopted*, No. 2:18-CV-900, 2019 WL 2437296 (S.D. Ohio June 11, 2019). This is because SSA guidance states that VE testimony "generally should be consistent with the occupational information supplied by the DOT." SSR 00-4p, *Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions*, 2000 WL 1898704, *2 (Dec. 4, 2000). In the present case, the ALJ, after acknowledging that the mental RFC had been "provided in somewhat more vocationally relevant

terminology," explained how she had considered the language of the PAMFs in the vocationally appropriate context. (Tr. 835). For example, where treatment records document coherent and linear thought process and the claimant was studying to obtain a pre-school teaching certification, the ALJ found Jones was capable of understanding, carrying out, and remembering simple tasks. (*Id.*). Similarly, where treatment records document good eye contact, normal speech, and coherent behavior, but also some times rapid speech and restricted affect, with down mood and low energy, the ALJ determined this reflected a moderate limitation in interactions with others and the RFC included a limitation to occasional interactions with supervisors, co-workers and the general public. (*Id.*). The ALJ similarly described conversions of language to vocationally relevant terms in all domains. (*Id.*). The explanations provided make abundantly clear to subsequent reviewers how the ALJ arrived at her decision, and thus represent a logical and accurate bridge as required.

Further, the specific examples cited by Jones as "different 'terminology'" such as "non-crowded environment" and "short cycle work tasks" do not countenance remand either. The ALJ properly accounted for these terms within the RFC, finding that Jones was limited to occasional interactions with supervisors, co-workers and the general public; and that he was unable to perform work requiring a specific production rate pace, such as assembly line work or an hourly production quota, respectively. (Tr. 828). These restrictions do not parrot the findngs of the PAMF directly, but it is settled law that "an ALJ is not required to recite the medical opinion of a physician verbatimin his residual functional capacity finding." *Poe*, 342 F. App'x at 157. Accordingly, the ALJ met her burden in evaluating the PAMFs.

34

## VII.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Jones' applications for DIB and SSI be affirmed.

Dated: November 20, 2025

Reuben J. Sheperd
United States Magistrate Judge

_____

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\*\*\*

Failure to file objection within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendations. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be

specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act." *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, 2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interests of justice. *See United States v. Wandashega,* 924 F.3d 868, 878-79 (6th Cir. 2019)